**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SUPPORTIVE CONCEPTS FOR FAMILIES, INC., RESOURCES FOR HUMAN DEVELOPMENT, INC., and INPERIUM, INC.<br><br>Plaintiffs | CIVIL ACTION |
| v. | CASE NO. 5:26-cv-8755 |
| DEPARTMENT OF HUMAN SERVICES of the Commonwealth of Pennsylvania; VALERIE ARKOOSH, individually and in her official capacity as Secretary of the Department of Human Services; KRISTIN AHRENS, individually and in her official capacity as Deputy Secretary of the Department's Office of Developmental Programs; LAUREN HOUSE, individually and in her official capacity as Director of the Bureau of Community Services under the Department's Office of Developmental Programs; ANGELA FORTNEY, individually and in her official capacity as Director of the Division of Program Administration within the Bureau of Community Services; RONALD MELUSKY, individually and in his official capacity as Director of the Division of Program Operations within the Bureau of Community Services; JENNIFER FRAKER, individually and in her official capacity as Northeast Regional Program Manager within the Bureau of Community Services; KATHERINE ALSTON, individually and in her official capacity as Southeast Regional Program Manager within the Bureau of Community Services; CHRISTOPHER HADLEY, individually and in his official capacity as Northeast Region Licensing Supervisor within the Bureau of Community Services; VALERIE BROWN, individually and in her official capacity as Southeast Region Licensing Supervisor within the Bureau of Community Services; and SHANNON RICO, individually and in her official capacity as Central Region Clinical Director within the Bureau of Community Services<br><br>Defendants | JURY TRIAL DEMANDED |

# COMPLAINT

Plaintiffs Supportive Concepts for Families, Inc., Resources for Human Development, Inc., and Inperium, Inc. (collectively, "Plaintiffs"), by and through their undersigned attorneys, Buchanan Ingersoll & Rooney PC, hereby bring this action against the above-named Defendants (collectively, "Defendants"), averring as follows:

## I. THE PARTIES

1. Plaintiff Supportive Concepts for Families, Inc. ("SCFF") is a Pennsylvania nonprofit corporation located at 3929 Perkiomen Avenue, Reading, Pennsylvania 19606.

2. Plaintiff Resources for Human Development, Inc. ("RHD") is a Pennsylvania nonprofit corporation located at 4700 Wissahickon Avenue, Suite 126, Philadelphia, PA 19144.

3. Plaintiff Inperium, Inc. ("Inperium") is a Pennsylvania nonprofit corporation located at 3929 Perkiomen Avenue, Reading, Pennsylvania 19606.

4. Inperium has been recognized by the Internal Revenue Service as a charitable organization described in Section 501(c)(3) of the Internal Revenue Service Code and type II supporting organization under Section 509(a)(3) of the Code. It is the parent of a network of human services organizations that provide, among other services, behavioral health, intellectual disability and other health related supports and services. Inperium is the parent of both SCFF and RHD, and SCFF and RHD are affiliates through their common nonprofit parent, Inperium.

5. Defendant Department of Human Services of the Commonwealth of Pennsylvania ("DHS") is a state administrative agency with central offices located at the Health and Welfare Building, 625 Forster Street, Harrisburg, Pennsylvania 17120.

6. Defendant Valerie Arkoosh ("Secretary Arkoosh") is the Secretary of DHS, and is sued in her individual capacity and official capacity.

7. DHS, through its Office of Developmental Programs ("ODP"), administers the Commonwealth's intellectual disability and autism (IDD/A) programs consisting of home and community-based services (HCBS), private Intermediate Care Facilities (ICF/IDs), and state-operated ICF/IDs known as "state centers." ODP also administers federal Medicaid HCBS programs in partnership with county/Administrative Entities.

8. Defendant Kristin Ahrens ("Deputy Secretary Ahrens") is the Deputy Secretary of ODP for DHS, and is sued in her individual capacity and official capacity.

9. Within ODP, the Bureau of Community Services ("BCS") is responsible for directing the planning, management, and oversight of the community based intellectual disability and autism programs administered by ODP—including the Consolidated Waiver, the Community Living Waiver, and the Person/Family Directed Services Waiver (P/FDS)—managed through four regional offices across the Commonwealth—Central,[1] Northeast,[2] Southeast,[3] and Western.[4]

10. Defendant Lauren House ("Director House") is the Director of ODP's BCS, and is sued in her individual capacity and official capacity.

---

[1] The Central Region encompasses the following Counties/Joinders: Adams/York, Bedford/Somerset, Blair, Cambria, Centre, Columbia/Montour/Union/Snyder, Cumberland/Perry, Dauphin, Franklin/Fulton, Huntingdon/Mifflin/Juniata, Lancaster, Lebanon, Lycoming/Clinton, Northumberland.

[2] The Northeast Region encompasses the following Counties/Joinders: Berks, Bradford/Sullivan, Carbon/Monroe/Pike, Lehigh, Luzerne/Wyoming, Northampton, Schuylkill, Susquehanna/Lackawanna, Tioga, Wayne.

[3] The Southeast Region encompasses the following Counties/Joinders: Bucks, Chester, Delaware, Montgomery, Philadelphia.

[4] The Western Region encompasses the following Counties/Joinders: Allegheny, Armstrong/Indiana, Beaver, Butler, Cameron/Elk, Clarion, Clearfield/Jefferson, Crawford, Erie, Fayette, Forest/Warren, Greene, Lawrence, McKean, Mercer, Potter, Venango, Washington, Westmoreland.

11. Defendant Angela Fortney ("Ms. Fortney") is the Director of the Division of Program Administration within ODP's BCS, which division is responsible for the oversight and administration of essential functions such as the allocation of waiver capacity, the oversight and monitoring of county programs, provision of technical assistance to stakeholders at all levels, and operationalization of waivers, regulations, DHS and office policy. Ms. Fortney is sued in her individual capacity and official capacity.

12. Defendant Ronald Melusky ("Mr. Melusky") is the Director of the Division of Program Operations within ODP's BCS, which division is responsible for guiding all licensing, incident management, and risk management activities, as well as for issuance and oversight of all enforcement activities. Mr. Melusky is sued in his individual capacity and official capacity.

13. Defendant Jennifer Fraker ("Ms. Fraker") is the Northeast Regional Program Director within ODP's BCS, and is sued in her individual capacity and official capacity.

14. Defendant Katherine Alston ("Ms. Alston") is the Southeast Regional Program Director within ODP's BCS, and is sued in her individual capacity and official capacity.

15. Defendant Chrisopher Hadley ("Mr. Hadley") is the Northeast Region Licensing Supervisor within ODP's BCS, and is sued in his individual capacity and official capacity.

16. Defendant Valerie Brown ("Ms. Brown") is the Southeast Region Licensing Supervisor within ODP's BCS, and is sued in her individual capacity and official capacity.

17. Defendant Shannon Rico ("Ms. Rico") is the Central Region Clinical Director within ODP's BCS, and is sued in her individual capacity and official capacity.

18. At all relevant times, Secretary Arkoosh oversaw and directed the administration and operations of DHS, including with respect to ODP, Deputy Secretary Ahrens, and other officials and staff.

19. At all relevant times, Deputy Secretary Ahrens oversaw and directed the administration and operations of ODP, including with respect to BCS, Director House, Ms. Fortney, Mr. Melusky, Ms. Fraker, Ms. Alston, Mr. Hadley, Ms. Brown, Ms. Rico, and other officials and staff.

20. At all relevant times, Director House, Ms. Fortney, and Mr. Melusky oversaw and directed the administration and operations of BCS, including with respect to its four regional offices, Ms. Fraker, Ms. Alston, Mr. Hadley, Ms. Brown, Ms. Rico, and other officials and staff.

21. At all relevant times, Ms. Fraker, Ms. Alston, Mr. Hadley, Ms. Brown, and Ms. Rico oversaw and directed administration and operations within their respective regional offices under BCS, including with respect to regional staff and county-level Administrative Entities, staff, and agents.

22. All non-entity Defendants identified above (*i.e.*, all Defendants other than DHS) are collectively referred to herein as the "Individual Defendants."

## II. JURISDICTION AND VENUE

23. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this action asserts claims under 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131 *et seq*., and the Rehabilitation Act ("RA"), 29 U.S.C. §§ 701 *et seq*.

24. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because one or more Defendants reside in this judicial district, a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and a substantial part of the property at issue is situated in this judicial district.

## III. STATEMENT OF FACTS

### A. SCFF's Critical Community Living Arrangements (CLAs) and Supports for Individuals with Intellectual and Developmental Disabilities

25. Among other services in the Commonwealth, SCFF operates Community Homes for Individuals with Intellectual Disabilities under 55 Pa. Code, Ch. 6400 pursuant to licenses/certificates of compliance issued by DHS's ODP.

26. SCFF has been duly licensed and operating in the Commonwealth for more than 30 years.

27. SCFF began as a single Ch. 6400 licensed home in Reading in 1993 supporting one person, and has since evolved into an integral community home provider operating across the Commonwealth and supporting State hospital closures and community capacity increases.

28. SCFF serves a very complex population, including many of the most medically, behaviorally, and dually diagnosed Pennsylvanians. SCFF has historically gone above and beyond to work with DHS's ODP to serve its most difficult individuals and, as evidenced by its growth over the past 30 years, has been able to create meaningful residential capacity *without Commonwealth funding for new homes*, allowing for people to age in their life-long homes while also taking in new consumers off the emergency waiting list.

29. In addition to Community Living Arrangements (CLAs), SCFF provides a number of other supports and programs to individuals with intellectual and developmental disabilities and autism (IDD/A), including home based assistance, day programs, adult training facility programs and services, employment services, and respite services. Other services include recovery housing and behavioral health community support.

30. While SCFF operates throughout the Commonwealth, its largest footprint is in the Northeast Region, where SCFF maintains 102 community homes that currently house

approximately 215 individuals with intellectual and developmental disabilities.

31. Of these approximately 215 residents, almost half (50%) have support needs at Level 5 or higher and nearly one-third (33%) have Level 7 support needs, who would likely be institutionalized if not for the services SCFF provides. There are few licensed providers capable of taking on individuals with such complex needs, and even fewer that have and would be willing to do so.

32. The average length of stay for these individuals is over 11 years, with many residing in SCFF homes for longer than 20 years and some exceeding 25 years (and counting).

33. Without SCFF, there is no clear alternative for these 200-plus intellectually and developmentally disabled individuals to obtain critical community-based housing and other supports, and SCFF is not aware of any other licensed provider with demonstrated replacement capacity to do so. Indeed, in some cases, it has taken ODP ***several years*** to find new placements for even a ***single*** consumer discharged by a provider.

**B. RHD's Critical Community Living Arrangements (CLAs) and Supports for Individuals with Intellectual and Developmental Disabilities**

34. Among other services in the Commonwealth, RHD operates Community Homes for Individuals with Intellectual Disabilities under 55 Pa. Code, Ch. 6400 pursuant to licenses/certificates of compliance issued by DHS's ODP.

35. RHD is a legacy nonprofit organization founded over 56 years ago in southeastern Pennsylvania.

36. RHD serves individuals and families with complex needs—including mental illness, developmental disabilities, chronic homelessness, substance abuse, post-traumatic stress, abuse, and other conditions—through diverse supports such as housing, education, community development, job training, career counseling, recovery, outsider art, returning citizens, and other

social services.

37. RHD has been providing home and community-based services (HCBS) for individuals with intellectual and developmental disabilities (IDD/A) in Pennsylvania since the 1970s.

38. While RHD operates throughout the Commonwealth, its largest footprint is in the Southeast Region, where RHD maintains 113 community homes that currently house 136 individuals with intellectual and developmental disabilities.

39. A significant percentage of these individuals have lived in RHD homes for longer than 20 years, with many residing for more than 30 years, some exceeding 40 years, and at least one approaching 50 years.

### C. Inperium's Constellation of Nonprofit Health and Human Service Providers

40. Inperium is a 501(c)(3) nonprofit and 509(a)(3) supporting organization headquartered in Reading, Pennsylvania, and maintains a substantial statewide presence across the Commonwealth.

41. Inperium brings together nonprofit health and human services providers into a deliberately structured network designed to strengthen each organization without eroding its independence, and in many cases provides a critical lifeline to nonprofits that would otherwise become insolvent and unable to continue carrying out their important missions. Over the years, Inperium has successfully preserved the charitable activities of a number of Pennsylvania organizations facing existential financial threats and thereby ensured the continued access to much-needed services for vulnerable populations in Pennsylvania.

42. Unlike traditional business combinations, affiliates retain their identity, leadership, and control over day-to-day operations while gaining the infrastructure, scale, support, and access to capital needed to achieve long-term financial stability and growth without compromising

mission or values.

43. SCFF was the first nonprofit organization in Inperium's network of affiliates. RHD, then on the verge of bankruptcy, affiliated with Inperium in December 2024.

44. As described herein, ODP's leadership has and continues to be engaged in a pattern and practice of invidious targeting and *ultra-vires* regulation of Inperium's affiliation model and affiliates, compromising the best interests of the Commonwealth and its disabled consumers.

45. This conduct includes, but is not limited to, misusing DHS's licensing and enforcement authority as leverage to compel changes to and impose conditions and limitations on the governance, structure, and finances of Inperium and its affiliates, even though nothing in the Pennsylvania Human Services Code or its regulations authorizes DHS to regulate such matters.

46. Despite the fact that Inperium is neither licensed by nor within DHS's regulatory jurisdiction, and instead falls under the purview of the Pennsylvania Office of Attorney General ("OAG"), ODP's leadership has taken a particular interest in Inperium and its operations, and DHS's internal records demonstrate longstanding, repeated, and ongoing animus and hostility toward Inperium.

47. DHS's internal records also indicate that SCFF and RHD both are and have been "under close scrutiny by ODP" based solely on being "affiliates of Inperium."

48. DHS's internal records further demonstrate that it closely monitors media and press relating to Inperium and its affiliates, especially that from the Philadelphia Inquirer, and ODP regulatory action has coincided with the release of negative media and press relating to Inperium and its affiliates.

49. Among other issues, Defendants' conduct discussed herein was undertaken in bad faith and for the purpose of harassing Plaintiffs and coercing concessions that DHS could not

lawfully obtain by other means.

50. Any legitimate concerns DHS may hold regarding the operations and structure of entities actually within its regulatory jurisdiction can and should be addressed at the time of licensing rather than through ex post facto revocation proceedings. Unfortunately, it is abundantly clear that ODP's tactic is instead choosing revocation—regardless of its detrimental effects on IDD/A individuals—precisely because ODP leadership is exceeding its authority to impose conditions and restrictions it could not secure otherwise.

51. At best, ODP leadership is using harassing enforcement actions and the draconian sanction of license revocation as a pretext for exacting programmatic and policy changes outside of appropriate legislative and regulatory processes—namely, trying to curtail, if not eliminate, Inperium's affiliate structure and footprint, nonprofit mission, operations, and property rights in the Commonwealth.

**D. DHS Revokes SCFF's Certificate of Compliance in the Northeast Region**

52. By letter mailed April 16, 2025, and signed by ODP Deputy Secretary Ahrens, DHS notified SCFF that it was revoking SCFF's certificate of compliance identified as CER-00235350 to operate Community Homes for Individuals with Intellectual Disabilities (55 Pa. Code, Ch. 6400) in the Northeast Region (the "Revocation Notice").[5]

53. The only grounds referenced in the SCFF Revocation Notice pertained to a single individual in a single community home. Despite this, SCFF's long operating history and

[5] By separate letter mailed April 18, 2025, also signed by ODP Deputy Secretary Ahrens, DHS notified SCFF that, as a result of revocation, it was prohibiting SCFF from "1. Providing any Home and Community-Based Services or base funded services to any individual not currently authorized for said service and served by SCFF[] in the Northeast region…" and "2. Enrolling of any new service locations in the Northeast Region..." under 55 Pa. Code, Chapter 6100 (the "SCFF Ban on Admissions").

exceptional service record, and the lack of prior provisional license status, DHS revoked SCFF's certificate of compliance as to all 102 community homes in the Northeast Region through which SCFF serves more than 200 intellectually and developmentally disabled individuals.

54. After SCFF commenced an administrative appeal challenging the revocation, the parties spent more than a year pursuing a negotiated resolution, including exchanging multiple drafts of a settlement agreement.

55. During the course of those discussions, it became clear that ODP was attempting to leverage the revocation proceedings as an improper, *ultra vires* means of regulating Inperium, its nonprofit mission, operations, and property rights, and imposing unreasonable restrictions on SCFF's lawful relationships with Inperium and affiliates well in excess of any requirements under Pennsylvania law—despite the fact that neither Inperium nor any affiliate was a party to the administrative proceedings, and had not been accused or found to have violated any laws or regulations—including, but not limited to: (a) unilaterally dictating the parameters of independent governance for SCFF; (b) prohibiting SCFF from having lease agreements for real property with Inperium or its affiliates, including requiring that SCFF terminate any such lease agreement in effect; (c) dictating the amount of management and administrative fees that can be paid to any parent organization, affiliate, or related entity; and (d) imposing restrictions and conditions on SCFF's ability to transact with Inperium or its affiliates.

56. ODP also demanded that SCFF reduce its footprint by ceasing operation of numerous community homes in the Northeast Region, requiring the individuals served in those homes to be transitioned to other providers, but prohibiting SCFF from (a) transitioning any individual to any Inperium affiliate or (b) transferring ownership and operation of any community home to any Inperium affiliate—regardless of the affiliate's licensing, qualifications, or capacity,

and irrespective of consumer choice—strictly because of status as an Inperium affiliate.

57. ODP leadership and other personnel expressed positions similar to those described above outside the course of efforts to reach a negotiated resolution.

58. ODP leadership has also indicated that ODP would withhold approval of any request by SCFF to transition an individual to any Inperium affiliate—again, regardless of the affiliate's licensing status, qualifications, or capacity, and irrespective of consumer choice—strictly because of status as an Inperium affiliate.

59. ODP leadership has further insinuated that ODP would refuse to assist in or approve any transition of an IDD/A individual to another provider—contrary to its regulatory obligations—unless SCFF transfers ownership or possession of its real property (*i.e.*, community homes) to the other provider, regardless of its impact on SCFF's property rights, or even SCFF's ability to secure fair market value, and to the clear detriment of the consumers.

60. On May 27, 2026, SCFF submitted a public records request to DHS under the Pennsylvania Right-to-Know Law ("RTKL") requesting, *inter alia*, categories of records relating to the demands being made by ODP, including: (a) any report, study, or assessment concerning the feasibility of transferring individuals under the care of SCFF to other providers, and the capacity, capability, and willingness of other providers to provide proper care to such individuals, particularly those who are dually diagnosed and/or have high support needs; (b) any planning, coordination, or outreach ODP had undertaken relating to the transfer of such individuals, including communications with other providers; (c) any other providers for which ODP had demanded or imposed similar restrictions, prohibitions, and additional requirements on lawful relationships with parent organizations, affiliates, service providers, and management companies; (d) ODP placing restrictions on, sanctioning, or excluding a company affiliated with a provider for

conduct that did not occur at or involve the affiliated company; and (e) any other providers for which ODP was monitoring, tracking, seeking information, or attempting to regulate the provider's parent organization and/or affiliates.

61. On May 29, 2026, Inperium submitted a public records request to DHS under the RKTL requesting, *inter alia*, categories of records relating to ODP's interest in, focus on, and monitoring of Inperium and its affiliates, including with respect to: (a) Inperium's operating structure and relationship to affiliates; (b) communications among ODP personnel regarding Inperium and its affiliates; (c) communications with and documents received from third parties regarding Inperium and its affiliates; (d) records and communications concerning Inperium's finances, assets, and public bond issuances; and (e) records and communications [inaccurately] describing or referring to Inperium as "private equity," a "conglomerate," a "holding company" or similar terms.

62. On June 5, 2026, SCFF submitted inquiries directly to ODP outside of the RTKL process seeking to better understand the demands being made by ODP to resolve the administrative proceedings and questioning how such demands would operate in practice and comport with Pennsylvania and federal law, including: (a) the legal basis and justification for including (and imposing prohibitions and requirements against) Inperium and affiliates that are not licensed or regulated by DHS, not parties to the administrative proceedings, and not accused of or implicated in any alleged noncompliance; (b) whether ODP had already selected or identified community homes for closure/transfer and IDD/A individuals for transfer to different providers; (c) the methodology and criteria that ODP had applied or would apply for selecting community homes for closure/transfer and IDD/A individuals for transition to different providers; (c) the availability of suitable alternative placements for such IDD/A individuals and the capacity, capability, and

willingness of other providers to accept such placements, particularly those who are dually diagnosed and/or have high support needs; and (d) how the transition of IDD/A individuals to alternative placements (assuming they are even available) would comply with consumer choice requirements—particularly if IDD/A individuals are barred from choosing any Inperium affiliate—and the mandates, protections, and individual rights under statutes like the ADA, RA, and Medicaid Act.

63. Among other deficiencies, ODP's response (or lack thereof) made clear that ODP had given no thought to—let alone planned or accounted for—how it's actions and demands would negatively impact and violate the rights of IDD/A individuals under SCFF's care, including, but not limited to, with respect to consumer choice and the (un)availability of alternative placements.

64. Following submission of the above-referenced RTKL requests and inquiries by SCFF and Inperium, ODP proceeded in July 2026 to conduct unannounced spot inspections at ***eighty (80)*** of SCFF's community homes in the Northeast Region, none of which were the subject of the existing revocation proceedings.

65. On information and belief, this overwhelming display of force came at the express direction of ODP leadership—and particularly Deputy Secretary Ahrens—with instruction to cite SCFF for every potential perceived noncompliance item, regardless of the circumstances, based on a purposefully overbroad application of the regulations and despite past practice, the clear goal being to intimidate and apply pressure on SCFF.

66. During these exhaustive inspections, ODP left no stone unturned in relentless pursuit of every possible "noncompliance" item it could muster, which predicably returned a slew of newly contrived "violations."

67. This includes items as minor as a citation under 55 Pa. Code § 6400.64(a) ("Clean

and sanitary conditions shall be maintained in the home") based on an individual's toothbrush touching the shelf of the bathroom cabinet located in the individual's own bathroom, and a similar citation for the toothbrush of a different individual at a different home "laying in their personal hygiene basket without protection."

68. ODP then utilized these "violations" to bolster its revocation of SCFF's certificate of compliance after the fact, mailing SCFF a letter on September 2, 2026 purporting to "amend" the basis for its earlier revocation decision (the "Amended Revocation Notice").

69. The Amended Revocation Notice—which was signed by Deputy Secretary Ahrens and issued more than ***16 months*** after the original Revocation Notice—greatly expanded the stated "basis" for ODP's revocation decision from ***six*** alleged "violations" involving ***one*** community home to ***more than 200*** alleged "violations" involving ***51*** community homes.

70. Among other indicators of bad faith and arbitrary decision-making, ODP did not even review the Plan of Correction ("POC") SCFF timely submitted on August 31, 2026 (in connection with the July 2026 spot inspections) before deciding to issue the Amended Revocation Notice. Indeed, it was not until October 8, 2026—38 days after the POC was submitted and 36 days after the Amended Revocation Notice was issued—that Mr. Hadley, Licensing Supervisor of ODP's BCS Northeast Region, even attempted to open the attachments to the POC.

**E. DHS Revokes RHD's Certificate of Compliance in the Southeast Region**

71. Apparently believing its overzealous inspections and Amended Revocation Notice against SCFF were not enough, ODP mailed a letter on September 22, 2026 (again signed by Deputy Secretary Ahrens) notifying RHD out of the blue, without even a prior provisional, that DHS was revoking RHD's certificate of compliance identified as CER-00254511 to operate Community Homes for Individuals with Intellectual Disabilities (55 Pa. Code, Ch. 6400) in the

Southeast Region (the "RHD Revocation Notice").[6]

72. The RHD Revocation Notice is clearly pretextual and was issued as a means of harassing, intimidating, coercing, and retaliating against Inperium and SCFF.

73. Rather than proceeding through regular administrative channels on the basis of good faith recommendations made by investigative personnel in the normal course, the facts and circumstances demonstrate that the RHD Revocation Notice was hastily prepared at the express direction of ODP leadership without a legitimate regulatory purpose.

74. Despite being barely longer than a page (only three conclusory sentences of which can reasonably be regarded as "substantive"), the Revocation Notice is riddled with typographical errors, inaccuracies, and inconsistencies, including, but not limited to, misidentification of RHD's address and attachment of a Licensing Inspection Summary (LIS) expressly stating that "***[n]o violations of the regulations measured at the date and time of inspection***."

75. The Revocation Notice is not only replete with errors and inconsistences, but is also overtly predicated on stale factual grounds ODP had already reconciled before fully renewing RHD's certificate of compliance in April 2026.

76. Moreover, the purported "violations" underlying the RHD Revocation Notice concern only 11 of 113 community homes operated by RHD. Despite this, RHD's long operating history, cooperation with ODP, and compliance record, ODP revoked RHD's certificate of compliance as to all 113 community homes in the Southeast Region through which RHD serves more than 130 intellectually and developmentally disabled individuals.

---

[6] By separate letter mailed September 22, 2026, also signed by Deputy Secretary Ahrens, DHS notified RHD that it was prohibiting RHD from "1. Providing any Home and Community-Based Waiver or base funded services to any individual not currently authorized for said service and served by RHD in the Southeast Region…, and 2. Enrolling any new service locations in the Southeast Region…" under 55 Pa. Code §§ 6100.741(a)-(b)(1)-(2), 742(3), (5) and 743(a) (the "RHD Ban on Admissions").

77. ODP's retroactive resurrection of previously reconciled grounds and hasty issuance of the deficient RHD Revocation Notice coincided with the above-described actions by ODP in aggressively targeting and seeking to impose restrictions on RHD's affiliate, SCFF, and their common nonprofit parent, Inperium.

78. It has been communicated to RHD on multiple occasions through various sources, ***including ODP staff***, that the decision to revoke RHD's certificate of compliance in the Southeast Region did not proceed through normal ODP processes and procedures and was instead expressly directed by Deputy Secretary Ahrens based on RHD's association with Inperium and SCFF.

79. ODP staff have also openly questioned and expressed dissatisfaction with the aggressive enforcement actions directed by ODP leadership against RHD, including the RHD Revocation Notice.

**F. ODP Continues its Aggressive Enforcement Tactics Targeting SCFF and RHD**

80. Following issuance of the SCFF Amended Revocation Notice and RHD Revocation Notice in September 2026, ODP has continued and escalated its aggressive enforcement tactics targeting SCFF and RHD.

81. This includes, but is not limited to, ODP conducting numerous unannounced inspections of SCFF and RHD community homes across multiple BCS regions in September and October (to date), including SCFF homes in the Northeast and Central Regions and RHD homes in the Northeast, Southeast, and Western Regions.

82. In conducting these inspections, ODP staff communicated on multiple occasions that they were instructed to return to properties even after good licensing visits.

83. ODP staff also communicated that the additional inspections were being conducted because of "powers outside of [their] control" and not due to anything happening in the region or at the home being inspected.

84. Unsurprisingly given the broad and arbitrary manner in which ODP has interpreted and applied regulations against SCFF and RHD, ODP "found" additional "violations" when it endeavored to going looking for them, including "violations" as minor as a bottle of ranch salad dressing that had been opened by an IDD/A individual and placed back in a dry cabinet rather than in the refrigerator.

85. ODP, through its BCS Regional Offices and their Program Managers and Licensing Supervisors, has also been unreasonably scrutinizing and requiring revision and resubmission of almost every report, plan, and other document submitted by SCFF and RHD, all in a manner that is contrary to DHS/ODP standard practice and departs from historical interactions.

86. This includes, in multiple instances, claiming deficiencies with respect to documents and information that had already been provided and requesting additional materials such as organizational charts and job descriptions unrelated to the matter at hand.

87. In other instances, ODP immediately escalated to higher levels of regulatory intervention—*e.g.*, going from a Corrective Action Plan (CAP) to a Directed Correction Action Plan (DCAP) and from a Plan of Correction (POC) to a Directed Plan of Correction (DCOP)—without any intervening communications, identification of purported deficiencies, or opportunity to cure purported deficiencies.

88. Moreover, while ODP continually demands that SCFF and RHD provide additional plans of correction, amendments, and other submissions on short notice and within days, ODP continually delays its review and return responses to such submissions by weeks, if not months, holding itself to different standards and further demonstrating the arbitrary and harassing nature of the demands being made of SCFF and RHD.

89. It has been communicated to RHD and SCFF on multiple occasions through various

sources, including ODP staff, that these targeted enforcement actions are being expressly directed by Deputy Secretary Ahrens and ODP leadership.

90. ODP staff have also continued to question and express dissatisfaction with these additional aggressive enforcement tactics directed at SCFF and RHD.

91. At the same time ODP is pursuing revocation against SCFF and RHD and citing them for every conceivable "violation" and "noncompliance" regardless of how far divorced from the spirit and purpose of the applicable regulation(s)—such as those related to salad dressing and where individuals place their own toothbrushes in their own bathrooms—ODP is picking and choosing to not enforce those and other regulations when it suits ODP, and threatening retribution if providers choose compliance over ODP's whims.

92. For example, at a meeting in November 2026, Defendant Shannon Rico (designated above as "Ms. Rico"), Clinical Director for ODP's BCS Central Region, openly threatened SCFF's CEO that "it would come back to bite [her] in the ass" if SCFF did not allow an IDD/A individual in the Central Region to have a "therapy bunny" even though the rabbit did not have any papers or certification as a therapy animal.

93. This comes after ODP cited "[s]taff had a puppy while in the home" as a basis for revoking RHD's certificate of compliance on September 22, 2026, the effect of which would require closure of 113 community homes and displacement of more than 130 intellectually and developmentally disabled individuals.

94. As a direct and proximate result of the unlawful conduct addressed herein, which remains ongoing, Plaintiffs have suffered and continue to suffer injury, including loss of revenue and licensure, displacement of residents, loss of staff, impairment of contractual and other lawful relationships, reputational harm, compliance and legal costs, and interference with governance

rights, in amounts to be proven at trial but certainly well in excess of arbitration limits.

95. ODP is intent, through its improper license revocations and other harassing enforcement activity, on trying to force Inperium and its affiliates to divest their property interests.

**G. Negative Impacts and Discriminatory Effects on IDD/A Individuals**

96. In addition to the harms, undue burden, and ongoing strain that Plaintiffs have sustained and continue to sustain due to Defendants' arbitrary, unreasonable, and aggressive enforcement tactics, the regionwide revocations of SCFF's and RHD's certificates of compliance in the Northeast Region and Southeast Region, respectively, would result in the closure of 215 community homes impacting more than 350 intellectually and developmentally disabled individuals, many of whom would need to be institutionalized or placed at a serious risk of institutionalization.

97. It is unclear where these intellectually and developmentally disabled individuals will obtain critical housing and other supports if ODP is ultimately successful in obtaining the result it claims to want to achieve, and ODP has not supplied SCFF or RHD with any plan or information as to how it would transition or otherwise accommodate these disabled consumers, if it has considered it at all, further impugning ODP leadership's motives and demonstrating the arbitrary nature of their actions.

98. SCFF and RHD own and control their own real estate. If SCFF and RHD's licenses are revoked, none of their consumers would have anywhere to reside and would all need new homes and accommodations.

99. Assuming, *arguendo*, that other licensed providers are even willing to take on all or even some of these disabled individuals (including those with higher support needs), Plaintiffs are aware of no other licensed provider in the Commonwealth with demonstrated replacement capacity to sustain simultaneous closure of either SCFF's Northeast Region CLAs ***or*** RHD's

Southeast Region CLAs—let alone both of them combined—and reestablishing that lost capacity would require considerable time, money, personnel, and resources that do not exist.

100. This is on top of the negative impacts of a forced transition for the numerous consumers who have been with SCFF and RHD for many years and wish to remain so, especially if suitable alternative housing can only be found in a different area, region or an institutional setting, including, *inter alia*, disrupting continuity of care, compromising individual service plans, and diminishing meaningful consumer and family choice.

101. Displacing such individuals from their current residential environments, particularly those who have high support needs and/or have lived in the same home and environment for an extended period of time, is irrational and irresponsible, if not medically dangerous, and likely to cause significant trauma for affected individuals.

102. Losing all of SCFF's and RHD's community homes and displacing all of their consumers in the Northeast Region and Southeast Region, respectively, would also compromise the Commonwealth's overall capacity to provide appropriate community-based residential services to its residents.

103. The Commonwealth currently operates only two state centers, reflecting the system's substantial dependence on home and community-based infrastructure and mission to de-institutionalize, not re-institutionalize.

104. Pennsylvania recently reported that more than 42,000 people receive IDD/A services in home and community settings, while a large statewide adult emergency waiting list remains.

105. Recognizing this need, Pennsylvania has continued to seek funding specifically to expand HCBS capacity, but that is very much a work in progress that will take time and still not

keep pace with demand.

106. The challenges posed by this complex issue are illustrated by two relatively recent discharge notices that SCFF submitted to ODP, one involving a consumer in the Northeast Region and the other the Western Region:

a. For the consumer in the Northeast Region, it took ODP more than two years to find a new placement with a different provider.

b. For the consumer in the Western Region, the discharge has been pending since May 2024, and ODP still has not been able to identify another appropriate provider.

These examples concern only ***two*** consumers, not a group of more than ***350***.

107. Moreover, the problem is even more acute for those with higher support needs, who are often denied placement by other providers, particularly where ODP just revoked the licenses of two of the providers (*i.e.*, SCFF and RHD) that have historically been willing to work with ODP to take on its most complex cases.

108. Despite being entirely foreseeable, these widespread downstream consequences have clearly not been appropriately considered by Defendants—which have no transition plan—further demonstrating the arbitrary nature of their actions and indifference to the rights of disabled individuals who rely on the programs administered by ODP.

109. Indeed, SCFF families have communicated their objection and disagreement with ODP's course of conduct directly to ODP, to which it is understood that ODP has not engaged or provided requested responsive information. Likewise, many SCFF families have expressed their support for SCFF and disapproval of ODP's conduct directly to SCFF. And yet, ODP continues to demonstrate utter disregard for consumer choice and the profound network adequacy needs

across Pennsylvania.

110. On information and belief, Secretary Arkoosh had knowledge of and, at a minimum, acquiesced in all of the events and actions described herein.

**COUNT I**
**42 U.S.C. § 1983**
**FOURTEENTH AMENDMENT – EQUAL PROTECTION**
*SCFF and RHD v. Individual Defendants*

111. The foregoing paragraphs are incorporated by reference as if fully set forth herein.

112. The Fourteenth Amendment expressly guarantees "equal protection of the laws," which establishes the foundational principle that "all persons similarly situated should be treated alike." *Shuman v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005).

113. The facts and circumstances here indicate that SCFF and RHD have been and continue to be targeted by the Individual Defendants and the subject of disparate treatment and selective enforcement.

114. SCFF and RHD are unlawfully being treated differently than other licensed providers, which are similarly situated in all material respects, through a pattern of systematic and ever-shifting selective enforcement activity, including retroactive enforcement when it suits ODP's needs, retaliation for exercise of constitutional and statutory rights (such as submitting RTKL requests and reasonable inquiries), and uneven application of the law in an unjustifiable and invidious manner.

115. This includes, but is not limited to, the Individual Defendants subjecting SCFF and RHD to enforcement action of a type and at a level not applied to other licensed providers; applying applicable statutes and regulations differently and more stringently against SCFF and RHD than other licensed providers; and citing SCFF and RHD for alleged violations and deficiencies of a type, in a manner, and under circumstances not applied to other licensed providers, all without any

legitimate justification for the disparity in treatment.

116. SCFF and RHD have also been subjected to a dramatically higher frequency of inspections, investigations, and reviews than other similarly situated providers holding the same type of license from the same agency, again without any justification for the disparity.

117. Such conduct amounts to the application of different standards, not merely different enforcement priorities, and deprives SCFF and RHD of their constitutional right to equal protection of the laws.

118. If that were not the case, and the Individual Defendants were treating all other licensed providers the same as SCFF and RHD, then this entire industry critical to the needs of intellectually and developmentally disabled individuals would be regulated out of existence.

119. At a minimum, the Individual Defendants will have created a regulatory environment so hostile, burdensome, and unpredictable that it compels existing providers in Pennsylvania to curtail operations or exit altogether while simultaneously deterring prospective entrants from establishing a presence, all to the detriment of disabled individuals.

120. Either result would of course be contrary to the Commonwealth's stated recognition of the need for more HCBS capacity, not less, and its stated policy goals of incentivizing growth and investment in this area. It would also be inconsistent with the binding representations and assurances that DHS made to the Centers for Medicare & Medicaid Services ("CMS") in applying for and securing waivers and federal funding for relevant Medicaid programs.

121. As a direct and proximate result of these actions, the Individual Defendants have caused and continue to cause SCFF and RHD harm.

122. The Individual Defendants acted willfully, maliciously, in reckless disregard of clearly established constitutional rights, and/or with deliberate indifference to the absence of any

rational basis for the actions taken.

**COUNT II**
**42 U.S.C. § 1983**
**FIRST AMENDMENT – RETALIATION**
*Plaintiffs v. Individual Defendants*

123. The foregoing paragraphs are incorporated by reference as if fully set forth herein.

124. A First Amendment retaliation claim requires "'(1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action. The first factor is a question of law; the second factor is a question of fact.'" *Saucon Valley Manor, Inc. v. Miller*, 392 F.Supp.3d 554 (E.D. Pa. 2019) (quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006)).

125. SCFF and Inperium exercised their constitutionally protected rights in late May 2026 by submitting requests to DHS under Pennsylvania's Right-to-Know Law seeking disclosure of public records.

126. SCFF also exercised its constitutionally protected rights in early June 2026 by making reasonable inquiries to better understand ODP leadership's atypical demands for resolving the revocation proceedings—including the basis for including and imposing *ultra-vires* regulation and restrictions related to Inperium and its affiliates despite not being parties or implicated in any alleged noncompliance—and to assess whether those demands comported with consumer choice requirements and individual rights protected by statutes like the ADA, RA, and Medicaid Act.

127. In retaliation for those actions, and in an effort to deter and chill the exercise of constitutionally protected rights, the Individual Defendants subjected SCFF and RHD to arbitrary and vindictive enforcement actions—indifferent to the adverse effects on the intellectually and developmentally disabled individuals served by SCFF and RHD—including the overzealous and biased inspections of 80 SCFF community homes in the Northeast Region, which predictably

returned a slew of contrived "violations" ODP used to bolster its revocation against SCFF after the fact, closely followed by the clearly pretextual revocation of RHD's certificate of compliance in the Southeast Region.

128. Such retaliatory conduct violated Plaintiffs' constitutional rights, and has caused (and continues to cause) Plaintiffs harm.

129. The Individual Defendants acted willfully, maliciously, in reckless disregard of clearly established constitutional rights, and/or with deliberate indifference to the absence of any rational basis for the actions taken.

**COUNT III**
**42 U.S.C. § 1983**
**FOURTEENTH AMENDMENT – DUE PROCESS**
*Plaintiffs v. Individual Defendants*

130. The foregoing paragraphs are incorporated by reference as if fully set forth herein.

131. The Due Process Clause of the Fourteenth Amendment prohibits state actors from depriving any person of property or liberty through arbitrary, irrational, or conscience-shocking governmental action, regardless of the procedures employed, and likewise requires notice and a meaningful opportunity to be heard before a person is deprived of a protected interest.

132. SCFF and RHD each hold constitutionally protected property interests, in, among other things: (a) the continued operation of their licensed community homes; (b) continued participation as providers in Medicaid and other government-funded programs; (c) payment for services rendered; and (d) real property interests and other assets that the Individual Defendants are improperly attempting to encumber and coerce them to divest.

133. All Plaintiffs also hold a constitutionally protected liberty interest in the right to engage in their chosen business and occupation free from arbitrary governmental interference, and in their reputations and good names, which the Individual Defendants have damaged in connection

with the alteration or impairment of Plaintiffs' legal status and rights, including their eligibility to operate and to receive public funds.

134. Inperium also holds its own constitutionally protected interests, independent of those of SCFF and RHD, including: (a) its liberty and property interests in managing its own corporate affairs, governance, and finances free from governmental compulsion that lacks any statutory or other legal basis; (b) its property interests in management or shared-services agreements, intercompany receivables, guarantees, funding streams, and other contractual relationships that are being impaired; and (c) its reputational interests, as set forth above.

135. The Individual Defendants' actions, individually and collectively, were arbitrary and capricious, bore no rational relationship to any legitimate governmental objective, and, in light of their pattern, duration, and improper motive, were so egregious and abusive of governmental power that they shock the conscience.

136. This includes the Individual Defendants' actions in creating an arbitrary, irrational, and unreasonably unpredictable regulatory and licensing regime, as well as their misuse of government power to extract governance, property divestiture, and financial changes from a non-regulated entity, all without regard for the deleterious impacts on covered persons and entities.

137. Indeed, the Individual Defendants are improperly using regulatory enforcement to try and reduce, if not eliminate, Inperium's footprint in Pennsylvania in favor of their preferred IDD/A providers.

138. The Individual Defendants' conduct is particularly egregious because the revocations place at risk the housing and care of more than ***350*** residents with intellectual and developmental disabilities.

139. The Individual Defendants deprived, and continue to deprive, Plaintiffs of their

protected property and liberty interests, including, but not limited to, by diminishing/threatening Plaintiffs' ability to operate, imposing unreasonable and *ultra vires* restrictions on lawful relationships with affiliates and contracting parties, interfering with the ownership, possession, use, and enjoyment of real property, interrupting revenue, damaging relationships with residents, families, and communities, and causing substantial and unjustified compliance costs.

140. The Individual Defendants also deprived Inperium of due process by imposing, and attempting to compel acceptance of, structural, governance, and financial requirements without notice of any legal basis, without a hearing, and without any administrative process whatsoever, since Inperium is not a licensee and has no appeal rights under DHS's licensing regime, thereby leaving Inperium with no procedure to challenge the Individual Defendants' actions.

141. These deprivations resulted from the misuse of established procedures and from the deliberate decisions of officials with final authority over certification and enforcement, and/or were not "random and unauthorized" acts, such that post-deprivation state remedies do not cure the violations.

142. As a direct and proximate result of these actions, the Individual Defendants have caused and continue to cause Plaintiffs harm.

143. The Individual Defendants acted willfully, maliciously, in reckless disregard of clearly established constitutional rights, and/or with deliberate indifference to the absence of any rational basis for the actions taken.

**COUNT IV**
**AMERICANS WITH DISABILITIES ACT**
**VIOLATION OF 42 U.S.C. § 12132 AND 28 C.F.R. § 35.130**
*SCFF and RHD v. DHS and Secretary Arkoosh, in her official capacity*

144. The foregoing paragraphs are incorporated by reference as if fully set forth herein.

145. DHS, as administered by Secretary Arkoosh, is a "public entity" subject to the

requirements of Title II of the ADA and its related regulations. 42 U.S.C. § 12131(1)(B).

146. The intellectually and developmentally disabled individuals who reside in community homes operated by SCFF and RHD and receive other supports from SCFF and RHD are all "qualified individual[s] with a disability" under Title II of the ADA. 42 U.S.C. § 12131(2).

147. The enforcement provision in Section 12133 of the ADA grants the right to bring a civil action to "any person alleging discrimination on the basis of disability." 42 U.S.C. § 12133.

148. Section 12132 of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefit of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity," 42 U.S.C. § 12132, and the federal regulation at 28 C.F.R. § 35.130(a) similarly provides that "[n]o qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity."

149. In enumerating non-exhaustive grounds that constitute unlawful discrimination under Title II of the ADA, the regulation at 28 C.F.R. § 35.130 further provides, in pertinent part:

> (b)(1) A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—
>
> > (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;
> >
> > (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;
> >
> > (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;
> >
> > …

> (vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.
>
> (3) A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:
>
> (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;
>
> (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or
>
> (iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.
>
> …
>
> (6) A public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a public entity establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability.
>
> (7)(i) A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability….
>
> …
>
> (d) A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.
>
> …
>
> (g) A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.

28 C.F.R. § 35.130(b)(1), (b)(3), (b)(6)-(7), (d), (g).

150. Under the above provisions, a public entity must administer services in the most integrated setting appropriate to the needs of qualified individuals with disabilities.

151. Additionally, a public entity may not use "methods of administration" that subject

individuals to discrimination or defeat or substantially impair the objectives of the program with respect to individuals with disabilities, or administer a licensing or certification program in a manner that subjects qualified individuals to discrimination.

152. A public entity also has an obligation to make reasonable modifications to its policies, practices, or procedures when necessary to avoid discrimination, and it certainly cannot administer a program irrespective of its discriminatory effect on qualified individuals.

153. Finally, a public entity also cannot undertake any practice, policy, or "method of administration" against a provider related to or associated with qualified individuals with disabilities if that practice, policy, or method would have a discriminatory effect, and it certainly cannot refuse to avoid the discriminatory effects of its actions—even if some enforcement action were warranted—particularly where other methods of administration and options for enforcement are readily available within its existing program.

154. Through the conduct described herein, DHS (as administered by Secretary Arkoosh) has violated all of the above and engaged in unlawful discrimination against qualified individuals with a disability; namely, by pursuing arbitrary and disproportionate regionwide revocations against SCFF and RHD without regard for the foreseeable harmful impacts to the IDD/A individuals served by SCFF and RHD and those seeking community placements.

155. DHS undertook these actions without a comprehensive, effectively working plan—or any plan at all—for the continued provision of community-based services to affected IDD/A individuals, necessarily and foreseeably placing them at serious risk of inappropriate institutionalization or other segregation, or of losing community services indefinitely or altogether.

156. DHS has also utilized and is utilizing discriminatory methods of administration by imposing revocation, the most severe sanction, without regard to lesser available sanctions and

without appropriately assessing or planning for the consequences to IDD/A individuals.

157. Similarly, DHS has administered and is administering its licensing and certification program in a discriminatory manner by exercising its power to revoke certificates of compliance without proportionality, planning, or protection for IDD/A individuals, such that revocation unnecessarily interrupts or results in the loss of their homes, services, and community integration.

158. DHS's methods of administration and licensing likewise have the effect of defeating or substantially impairing the accomplishment of the objectives of the Commonwealth's programs for IDD/A individuals, including by: (a) reducing rather than expanding the number of community homes available; (b) increasing the likelihood of unnecessary institutionalization or other segregation, contrary to the stated objective of enabling IDD/A individuals to live in their communities in the most integrated setting appropriate; and (c) destabilizing the provider network on which the Commonwealth's programs depend, including providers' financing, staffing, and ability to take on new individuals.

159. DHS is also seriously undermining the Commonwealth's programs by signaling to current and prospective providers that any perceived regulatory deficiencies, however correctible and/or limited in scope, may result in the abrupt loss of all community homes and operations across an entire region, thereby discouraging investment in, and the development of, community homes and the willingness of providers serve individuals with significant support needs.

160. Stifling growth and investment in this manner will cause demand to outpace supply at an even greater clip, severely inhibiting the Commonwealth's ability to move qualified individuals into community placements at an acceptable rate and making an already long waiting list even longer.

161. Moreover, in targeting SCFF and RHD in the manner described herein, DHS is

treating SCFF and RHD consumers differently from those served by other providers, thereby (a) denying them the opportunity to participate in and benefit from HCBS programs; (b) affording them benefits that are not equal to those afforded to others and/or not as effective in affording an equal opportunity to obtain the same result; and (c) otherwise limiting them in the enjoyment of rights, privileges, advantages, and opportunities enjoyed by others.

162. In so violating Title II of the ADA and causing harm, DHS (as administered by Secretary Arkoosh) acted willfully, maliciously, in reckless disregard of clearly established constitutional rights, and/or with deliberate indifference to the absence of any rational basis for the actions taken.

## COUNT V
## REHABILITATION ACT
## VIOLATION OF 29 U.S.C. § 794 AND 28 C.F.R. § 41.51

*SCFF and RHD v. DHS and Secretary Arkoosh, in her official capacity*

163. The foregoing paragraphs are incorporated by reference as if fully set forth herein.

164. Similar to Title II of the ADA, Section 504 of the RA provides, in pertinent part, that "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance," 29 U.S.C. § 794, and the corresponding regulation at 28 C.F.R. § 41.51(a) similarly provides that "No qualified handicapped person, shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity that receives or benefits from federal financial assistance." *See also* 28 C.F.R. § 41.51(b)(1), (b)(3)-(4), (d).

165. DHS, as administered by Secretary Arkoosh, is a recipient of federal assistance engaged in the operation of a "program of activity" and, as such, is subject to the requirements of

the RA, including Section 504 and its implementing regulations. 29 U.S.C. § 794(b)(1).

166. The anti-discrimination provisions of Section 504 of the RA and Section 12132 of the ADA are construed constituently and applied in a parallel manner. *See, e.g., New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 303 (3d Cir. 2007); *Pennsylvania Prot. & Advoc., Inc. v. Pennsylvania Dep't of Pub. Welfare*, 402 F.3d 374, 379 & n.3 (3d Cir. 2005).

167. For the same reasons set forth in the count above, which is incorporated herein by reference, DHS has violated Section 504 of the RA and the corresponding federal regulation at 28 C.F.R. § 41.51.

168. In so violating Section 504 of the RA and causing harm, DHS (as administered by Secretary Arkoosh) acted willfully, maliciously, in reckless disregard of clearly established constitutional rights, and/or with deliberate indifference to the absence of any rational basis for the actions taken.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendants and grant the following relief:

1. Declare that the Individual Defendants' conduct violated Plaintiffs' rights under the U.S. Constitution;

2. Enjoin the Individual Defendants from continuing their violations of Plaintiffs' constitutional rights, including the arbitrary, unreasonable, and unlawful regulatory and enforcement activity described herein;

3. Award compensatory damages against the Individual Defendants, in their individual capacities, in connection with their violations of Plaintiffs' constitutional rights, in an amount to be determined at trial and in excess of arbitration limits;

4. Declare that DHS (as administered by Secretary Arkoosh) violated Title II of the ADA and Section 504 of the RA;

5. Enjoin DHS (as administered by Secretary Arkoosh) from continuing its conduct in violation of Title II of the ADA and Section 504 of the RA, including its discriminatory methods of administration, discriminatory administration of a

licensing or certification program, and discriminatory practices against disabled individuals associated with SCFF and RHD;

6. Award compensatory damages against DHS (as administered by Secretary Arkoosh) in connection with its violations of Title II of the ADA and Section 504 of the RA, in an amount to be determined at trial and in excess of arbitration limits;

7. Award reasonable attorneys' fees, costs, and expenses incurred as permitted by law, including under 42 U.S.C. § 1988, the ADA, and the RA; and

8. Such other and further relief as the Court may deem just, proper, and equitable.

**JURY DEMAND**

Plaintiffs respectfully demand a trial by jury on all issues so triable.

Respectfully submitted,

BUCHANAN INGERSOLL & ROONEY PC

*<u>/s/ H. Marc Tepper</u>*
H. Marc Tepper (Pa. ID No. 49084)
Two Liberty Place, 50 S. 16th St., Suite 3200
Philadelphia, PA 19102
(215) 665-8700
*marc.tepper@bipc.com*

Kyle J. Meyer (Pa. ID No. 307743)
409 N. Second Street, Suite 500
Harrisburg, PA 17101
(717) 237-4887
*kyle.meyer@bipc.com*

*Attorneys for Plaintiffs*

Date: November 16, 2026